**Thomas O. BARNES, Appellant,**

v.

**Harold I. SMALL, General, et al.**

**No. 86–5563.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 8, 1987.

Decided March 8, 1988.

Charles A. Hobbie, with whom Mark D. Roth, Washington, D.C., was on brief, for appellant.

William J. Dempster, Asst. U.S. Atty., New York City, of the bar of New York State Court of Appeals, Second Judicial Dept., pro hac vice, by special leave of Court, with whom Joseph E. DiGenova, U.S. Atty., Royce C. Lamberth and Michael J. Ryan, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before EDWARDS, SILBERMAN and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Appellant Thomas O. Barnes was employed by the Department of Army, Military Traffic Management Command ("MTMC" or "agency") for approximately fourteen years prior to his removal in August 1983 because he wrote a series of letters to the MTMC commander containing numerous charges against other MTMC employees. At the time of his removal he held the position of computer programmer. He was a member of the American Federation of Government Employees, AFL-CIO, Local 909 since 1970, serving as an officer of the union from 1975 and as acting president from August 1980. Barnes' main activity as acting president involved representing employees who filed grievances and discrimination complaints. This is an appeal from a district court decision dismissing Barnes' claim that he was discharged in retaliation for representing a Title VII race discrimination complainant and sustaining a Merit Systems Protection Board decision that his discharge was justified and lawful. In this appeal, Barnes raises numerous issues, which require us to consider both constitutional and statutory protections afforded to federal employees. We affirm the decision of the district court that Barnes' discharge did not violate the Constitution, Title VII of the Civil Rights Act, or any federal labor relations statutes.

I.

Barnes, as spokesman for or representative of MTMC employees, participated in two personnel proceedings in early 1983. In January he represented Harold Garnett in an appeal to the Merit Systems Protection Board ("MSPB" or "Board") after Garnett was terminated for repeated absence without leave. In his appeal, Garnett alleged racial discrimination by several of his superiors. Garnett was an employee of the 7th Signal, a part of the Army's Communication Command, and along with a number of other 7th Signal civilian employees was assigned to work in the same building as the MTMC, under a 7th Signal commander. MTMC staff furnished administrative support to 7th Signal employees located in the

MTMC building, particularly personnel and equal employment opportunity counseling, so it was not unusual for Barnes to represent Garnett, even though Garnett was not an employee of the same agency. Two months after Garnett's hearing, Barnes, in his capacity as acting president of the union, attended a labor-management meeting concerning the downgrading of several MTMC positions. Also present at this meeting was Linda Cunningham, an MTMC management representative, responsible for administering labor relations programs. During the meeting, Barnes complained about the agency's failure to notify affected employees in a timely fashion; there followed one of many verbal disputes between him and Cunningham.

Roughly ten days after the March meeting, Barnes wrote six letters on union letterhead to General Bruen, the MTMC Commander, charging various MTMC employees, and especially Cunningham, with serious misconduct (including criminal behavior) in connection with these two personnel proceedings.[1] Barnes accused Cunningham of, *inter alia*, placing him under surveillance, "conducting [a] personal vendetta and slandering wildly," making false statements, and actually committing perjury on four separate occasions. Another MTMC staff employee was denounced for making a deliberately false statement, and a third was threatened with a charge of perjury. Barnes also claimed to have been criminally assaulted by MTMC's civilian personnel officer, Mr. Lee, and that agency records had been falsified to support 7th Signal's disciplinary action against Garnett.

Upon receipt of these letters, General Bruen ordered an investigation into the allegations to be conducted by Colonel Lawlor, an officer not personally involved in any incidents described in the letters and not acquainted with Barnes. Following his investigation, Colonel Lawlor prepared a written report stating he had found no evidence to substantiate Barnes' allegations.

In August 1983, after receiving advance notice of his proposed removal and an opportunity to respond, Barnes was dismissed for knowingly making false and malicious statements with intent to harm the authority, reputation, and official standing of other agency employees in violation of Army Regulation AR 690–700 (c 14), 751.A. Previously in 1981 Barnes had received a five-day suspension for the same offense; the applicable regulation specifies removal as the penalty for a second violation. Just as the one under consideration here, the 1981 violation arose out of Barnes' participation in personnel proceedings. On that occasion, during an informal Equal Employment Opportunity adjustment meeting, Barnes, who is white, made several derogatory statements, including a demeaning racial comment directed at an MTMC employee.

Barnes, asserting he was actually fired in retaliation for his representation of Garnett and his participation in the labor-management meeting, appealed his dismissal to the Merit Systems Protection Board and his union requested the General Counsel of the Federal Labor Relations Authority ("FLRA") to issue an unfair labor practice complaint against the MTMC. The Board upheld Barnes' dismissal, and the FLRA General Counsel declined to issue a complaint because "[Barnes'] statements contained in the letters were false and, when viewed in their totality, established that the acting president had knowingly engaged in flagrant misconduct falling outside the protection of the Statute." Joint Appendix ("J.A.") at 287. Barnes then appealed the decision of the Merit Systems Protection Board to the district court. The district court reviewed that decision pursuant to 5 U.S.C. § 7703(c) (1982), which provides that discrimination claims shall be "subject to trial *de novo* by the reviewing court" while other claims are reviewed on the record. His dismissal was upheld by the district court and Barnes now appeals that decision to this court. We turn first to Barnes' discrimination claim.

---

1. Five of the letters referred to Garnett's appeal and the remaining letter referred to the labor- management meeting.

## II.

Appellant claims the agency violated Title VII of the Civil Rights Act by removing him in retaliation for his participation as Garnett's representative in a Title VII race discrimination proceeding. *See* 42 U.S.C. §§ 2000e–3(a), 2000e–16 (1982). In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–06, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973), the Supreme Court set out the order of proof in Title VII cases. This framework also applies to claims of retaliatory dismissal. *McKenna v. Weinberger,* 729 F.2d 783, 790 (D.C.Cir.1984). "In order to establish a *prima facie* case of retaliation, a plaintiff must show: (1) that [he] engaged in a statutorily protected activity; (2) that the employer took an adverse personnel action; and (3) that a causal connection existed between the two." *Id.*

After a two-day trial, the district court concluded that Barnes had not made a *prima facie* case of reprisal, because, as the court concluded, writing and sending the letters did not constitute protected activity at all; according to the court the letters were unrelated to Barnes' activities as Garnett's representative. We may overturn factual findings of the district court only if "clearly erroneous," *Pullman–Standard v. Swint,* 456 U.S. 273, 290, 102 S.Ct. 1781, 1791, 72 L.Ed.2d 66 (1982); Fed.R.Civ.P. 52(a), and, as we have previously noted, in Title VII cases the Supreme Court has been particularly forceful in admonishing Courts of Appeal not to exceed that limited standard of review. *Bishopp v. District of Columbia,* 788 F.2d 781, 785–86 (D.C.Cir. 1986); (citing *Anderson v. Bessemer City,* 470 U.S. 564, 573–76, 105 S.Ct. 1504, 1511–13, 84 L.Ed.2d 518 (1985)). It is not completely clear, however, whether a determination that a plaintiff has failed to make out a *prima facie* case is a question of fact governed by the clearly erroneous standard of review or a question of law subject to review *de novo. See, e.g., Hagans v. Clark,* 752 F.2d 477 (9th Cir.1985).

In this case, however, we think the district court's conclusion that the letters were unrelated to Barnes' representation of Garnett was a conclusion of law, and so not entitled to deference. This is so, because the determination largely depended upon an interpretation of Title VII, which prohibits retaliation against any employee because "he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). The district court observed that one of the six letters did not even concern Garnett, while the rest did not specifically request relief for Garnett and contained allegations unrelated to Garnett's appeal. The court therefore concluded the writings did not fall within the protection of the statute.

■ We think this legal conclusion is incorrect. The statutory prohibition against discrimination is very broad, protecting an employee who "participate[s] in *any* manner" in a Title VII proceeding. Since at least five of the letters alleged wrongdoing during the Garnett hearing, and if credited, might have moved General Bruen to take action favorable to Garnett, it seems to us they clearly were part and parcel of Barnes' representation of Garnett. Nor do we think it of any significance, contrary to the district court, that Garnett, an employee of 7th Signal, was not under General Bruen's command, for the management personnel of whom Barnes complained were subordinates of the General. Barnes had represented employees in the past (and could be expected to have continued to do so in the future) in proceedings in which the same individuals would have represented management. If General Bruen had become convinced that his subordinates had misbehaved in the Garnett case, it is likely he would have taken action to prevent any future similar occurrences. Even had there been no possibility of benefiting Garnett, therefore, we would still regard the writing of the letters as protected activity—we would see them as an effort to affect future proceedings. For these reasons, the district court's view of protected activity is too narrow as a matter of law.

The district court did not rest its decision solely on its conclusion that the letters

were not related to Garnett's appeal, however. Assuming arguendo Barnes had made out a *prima facie* case, the court proceeded in the alternative to find that the government had provided a legitimate reason for his discharge—the letters, even if related to Garnett's representation, included false and malicious statements that interfered with the efficient operations of the agency. Behavior that appears to fall within the protection of § 2000e–3(a), and so, for purposes of evaluating whether plaintiff has made out a *prima facie* case, is presumed to be protected, may, after the government (the employer) has put on its evidence, ultimately be determined to be— at least in part—unprotected. *See, e.g., Parker v. Baltimore & Ohio R.R.*, 652 F.2d 1012, 1020 (D.C.Cir.1981) (excessively forceful opposition, including malicious accusations, may forfeit protection of § 2000e–3(a)); *Pendleton v. Rumsfeld*, 628 F.2d 102, 107 (D.C.Cir.1980) (if employee is fired for improper manner of opposition to racial discrimination, rather than for the opposition itself, § 2000e–3(a) is not violated). In this case, the district court could not determine whether the letters contained false and malicious statements, and to that extent were therefore unprotected, until the government presented its defense. The court's determination that the statements were false and malicious is a finding of fact which we review on a clearly erroneous standard.[2] We may only reverse if, after reviewing the entire evidence, we are " 'left with the definite and firm conviction that a mistake has been committed.' " *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).

The district court's determination is, however, amply supported. Barnes accused Cunningham of perjury based on her testimony in the Garnett appeal before the MSPB because she testified that a particular meeting had been arranged by telephone rather than in person. Since the mode of communication was irrelevant to the issues in that proceeding, Cunningham's statement, even if incorrect, could not have been perjury. Barnes further claimed that Cunningham committed perjury by testifying she had never left the room during a particular meeting, yet the transcript reveals Cunningham actually testified she did not recall whether she had left the room.

To be sure, perjury is a term laymen can sometimes misunderstand, but in his written response to notice of proposed removal, Barnes explained, by way of excuse, that he had not even referred to the transcript before leveling the perjury charge at Cunningham. And at the MSPB hearing Barnes offered a legally correct definition of the term when queried by his attorney, thus indicating he did understand the nature of the charge he was making. Indeed, in one of the six letters, Barnes states that "[p]erjury is a serious charge," and before the MSPB and this court Barnes alleges his behavior is protected by 5 U.S.C. § 2302(b)(8), which shields employees who report illegal activity. So at the time he wrote the letters, and continuing to the present, Barnes knew he was making grave charges with serious implications.

In another letter to General Bruen, Barnes accused an MTMC employee of criminally assaulting Barnes (a year and a half earlier). This "assault" was shown to involve only a single piece of paper allegedly tossed at Barnes. Perhaps the most

---

**2.** The factual finding of malice in the context of a Title VII suit, in contrast to a libel suit, does not implicate the First Amendment. *See infra* note 7. Therefore, the heightened scrutiny appellate courts are directed to give findings of malice in a libel case, *see Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 514, 104 S.Ct. 1949, 1967, 80 L.Ed.2d 502 (1984) (clearly erroneous standard is not applicable to finding of actual malice in cases governed by *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)); *Tavoulareas v. Piro*, 817 F.2d 762, 788–89 (D.C.Cir.1987), is not required here. The finding of malice is largely dependent on a determination concerning the mental state or intent with which the false statements were made, and so, like a determination of discriminatory intent, is clearly a finding of fact, to be reviewed pursuant to Fed. R.Civ.P. 52(a). *See Pullman–Standard v. Swint*, 456 U.S. 273, 287–90, 102 S.Ct. 1781, 1789–91, 72 L.Ed.2d 66 (1982).

serious allegation was Barnes' statement that Garnett's discharge had been based on "falsified records." This turned out to refer (at most) to notations added to Garnett's attendance sheets—notations which had been fully explained at the Garnett EEO hearing attended by Barnes. The remainder of the numerous allegations in the six letters are of similar character.

Appellant contends his accusations were mere hyperbole—such as are the warp and woof of collective bargaining—and therefore the agency was not justified in inferring malice.[3] But the charges, formally made, were serious enough to oblige General Bruen to cause an expensive and time-consuming investigation to be conducted. And, if the allegations had been found to be true, those accused by Barnes would have been discharged. By raising the level of his accusations to encompass criminal conduct, Barnes deliberately went beyond hyperbole. Barnes, moreover, had previously been suspended for the same offense; he was on notice that such conduct was unacceptable. Therefore we cannot conclude the district court was clearly erroneous in finding that the agency's grounds for discharge were not discriminatory and thus that Barnes had failed to establish a violation of Title VII.[4]

3. Appellant refers to the decision of the MSPB, which inferred malice from Barnes' negative attitude towards management displayed while acting as a representative in Title VII cases. Appellant correctly notes that it would not be wrong for a labor representative to display such an attitude in what are often adversarial proceedings and thus that malice could not properly be inferred from this. The district judge, however, was trying Barnes' discrimination claim *de novo,* and in that respect was not reviewing the MSPB decision, but rather the agency's decision to remove Barnes. In its removal letter, the agency clearly inferred malice and an intent to harm from the nature of the charges themselves, the manner in which they were made, and the lack of basis for them. It was *this* finding of malice that the district court found justified. *See Barnes v. Small,* No. 84–2569, mem. op. at 5, (D.D.C. July 8, 1986), *reprinted in* J.A. at 11.

4. Once the defendant provides a non-discriminatory reason for discharge, "plaintiff must prove by a preponderance of the evidence that the proffered reason was but a pretext for retaliation." *McKenna,* 729 F.2d at 790 (footnote

Barnes argues that his statements cannot be a legitimate justification for discharge under Title VII because they were protected by the union's contract, the Civil Service Reform Act of 1976, and the First Amendment. These separate arguments are not, however, appropriately raised in an appeal from a Title VII proceeding, where the issue is simply the presence of discrimination *vel non.* These identical claims were made by Barnes before the MSPB—where the discharge was claimed to be a prohibited personnel practice—and again in the district court, and so we treat them in the next part of the opinion.

### III.

■ In addition to his discriminatory reprisal claim under 42 U.S.C. § 2000e–16, appellant filed separate claims before the district court concerning the Merit Systems Protection Board's determination that his dismissal did not constitute a prohibited personnel practice under 5 U.S.C. § 2302(b)(1)(A), (b)(8)–(11) (1982),[5] and did not violate the First Amendment, federal labor relations law, or the collective bargaining agreement between Barnes' union and the agency. Normally, an appeal of an

omitted). The district court found Barnes had introduced no credible evidence that the agency's reason was pretextual, and on appeal Barnes points to no evidence of pretext, but merely argues that the allegations contained in the letters were either not false or malicious in the first place or were protected. As the district court's finding that Barnes failed to meet the burden of showing pretext is not clearly erroneous, Barnes has not shown his discharge was in retaliation for his representation of Garnett, and we affirm the district court's ruling on this issue.

5. Section 2302 sets out a number of prohibited personnel practices. Section 2302(b)(1)(A) prohibits the violation of 42 U.S.C. 2000e–16. Section 2302(b)(8) prohibits reprisal for the disclosure of information which the employee reasonably believes is a violation of the law. Section 2302(b)(9) prohibits reprisal for exercising any appeal right. Section 2302(b)(10) prohibits discrimination on the basis of conduct which does not adversely affect the performance of the employee. Section 2302(b)(11) prohibits any action which is inconsistent with merit system principles.

MSPB decision would be filed in the Court of Appeals for the Federal Circuit. 5 U.S.C. § 7703(b)(1) (1982). But, where the appellant makes a claim of discrimination, as did Barnes, he has a right to *de novo* review in the district court of that claim. 5 U.S.C. § 7703(b)(2) and (c). And where the MSPB decides a case combining both discrimination and non-discrimination claims, the district court takes jurisdiction over appeals from both determinations, but reviews the non-discrimination claims on the record. *Williams v. Dep't of Army,* 715 F.2d 1485 (Fed.Cir.1983) (*en banc* ); *Hayes v. United States Gov't Office,* 684 F.2d 137 (D.C.Cir.1982). Thus, in its consideration of the joined nondiscrimination claims, on appeal from the MSPB's determination, the district court may set aside the administrative adjudication only if it is arbitrary or capricious, obtained without compliance with lawful procedures, unsupported by substantial evidence or otherwise not in accordance with law. *See* 5 U.S.C. § 7703(c).

█ The district court held the decision of the Merit Systems Protection Board sustaining Barnes' discharge was not arbitrary and capricious, and was supported by substantial evidence. As to appellant's claims under § 2302(b)(1)(A), (b)(8)–(9), each of which prohibits reprisal for engaging in protected activity, including reporting illegal actions and exercising any appeal rights, the district court's rejection of these claims is consistent with its finding that Barnes was removed for making false and malicious statements with the intent to harm fellow employees, and not as a reprisal for other behavior. That is also the basis on which the MSPB upheld Barnes' discharge. Appellant argues, nevertheless, that the MSPB did not have substantial evidence that his statements were malicious. We disagree. The MSPB hearing officer inferred malice and an intent to harm agency employees from the content of the letters and the gravity of their allegations, the false nature of the charges, and Barnes' ready access at the time he wrote the letters to material that would have shown at least some of the charges to be false.[6] Thus, the record contains "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) and so we affirm the district court.[7]

█ A federal employee's removal may not be sustained by the MSPB unless the agency is able to show by a preponderance of the evidence that the employee's actions adversely affected either his performance or that of other employees and that his removal would "promote the efficiency of the service." 5 U.S.C. § 7513(a) (1982); 5 C.F.R. § 752.403(a) (1987).[8] The efficiency-of-the-service standard "require[s] an agency that proposes to remove an employee for

---

**6.** As we stated previously, *supra* note 3, the MSPB hearing officer also improperly inferred malice from Barnes' negative attitude at labor-management meetings. Without that inappropriate inference, however, the evidence of malice is still substantial, and thus remand is unnecessary. " 'A court will not reject an agency finding that is supported by substantial evidence merely because the agency also incidentally mentions incompetent or irrelevant material.' The appropriate standard is to remand for correction of an error only when there is substantial doubt that the administrative agency would have reached the result it did absent reference to the material." *Consolidated Gas Supply v. Federal Energy Regulatory Comm'n,* 606 F.2d 323, 329 (D.C.Cir.1979) (quoting *Braniff Airways v. CAB,* 379 F.2d 453, 466 (D.C.Cir.1967)).

**7.** Appellant claims the MSPB decision conflicts with the stricture set forth in *Burkett v. United States,* 402 F.2d 1002, 1007–08 (Ct.Cl.1968), that "[f]or an offence so intimately related to the constitutional protections of free speech and the right to petition ..., both the malice and the intent-to-harm should be of relatively high order." We note first that *Burkett* was decided prior to *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), which held that discharge for speech on matters not of public concern does not violate the First Amendment. Also, in *Burkett* the plaintiff's sole intent-to-harm was an intent to embarrass his superior, whereas here it can reasonably be inferred from the letters themselves that Barnes' intention was a good deal more serious—if his allegations had been credited the employees charged might have faced removal or worse.

**8.** Without substantial evidence of adverse effect, 5 U.S.C. § 2302(b)(10–11) would also be violated. *See supra* note 5.

misconduct to demonstrate a sufficient nexus between the misconduct and the job performance of the employee or others to warrant removal." *Gloster v. General Servs. Admin.,* 720 F.2d 700, 703 (D.C.Cir. 1983). Appellant claims the agency failed to present substantial evidence on these issues to the Merit Systems Protection Board. Not so. The MSPB hearing officer determined that Barnes' unfounded accusations justifiably eroded management's confidence in his judgment and resulted in considerable disruption of agency work due to the time and expense necessary to investigate the charges and also interfered with the personnel who were the objects of his accusations. That Barnes' work as a computer programmer for the agency did not itself suffer does not mean his allegations did not affect the performance of others. And the positive effect on the efficiency of the service of removing an employee who causes expensive investigations to be undertaken for no good reason is obvious.

Barnes next contends the statements in question were protected by 5 U.S.C. §§ 7102, 7116, and by provisions in the collective bargaining agreement between his union and the agency and thus as a matter of law could not provide a legitimate reason for his discharge. Section 7102 is part of the Federal Service Labor–Management Relations Act, 5 U.S.C. §§ 7101 *et seq.* (the "Act"); it grants federal employees the right to assist labor organizations without penalty or reprisal and the right to present the views of labor organizations to agency heads. The relevant provisions of the collective bargaining agreement are similar—they afford employees various rights, including the right "to freely communicate with" various MTMC personnel officers. J.A. at 182–83. Section 7116 declares it shall be an unfair labor practice for an agency to interfere with any employee's exercise of rights granted by the Federal Service Labor–Management Relations Act and to enforce any rule that conflicts with the collective bargaining agreement. The district court granted summary judgment to the defendant agency on each of Barnes' claims based on these provisions, holding it had no jurisdiction to consider them, as they were subject to the exclusive jurisdiction of the Federal Labor Relations Authority.[9] *Barnes v. Small,* No. 84–2569, mem. op. on cross-motions for summary judgment at 3–4, (D.D.C. Mar. 10, 1986), *reprinted in* J.A. at 18–19. We believe this was the correct disposition of these claims.

The FLRA is charged with administering the Federal Service Labor–Management Relations Act and the General Counsel of the FLRA is responsible for investigating claims of unfair labor practices. Because he found that the statements in the six letters were false and "when viewed in their totality, established that [Barnes] had knowingly engaged in flagrant misconduct falling outside the protection of the Statute," the FLRA General Counsel refused to issue a complaint against the agency. J.A. at 287.[10] That decision by the General Counsel not to issue an unfair labor practice complaint is

9. In its summary judgment opinion, the district court indicated it would consider evidence of anti-union animus in its decision on Barnes' retaliatory discharge case. *Barnes,* mem. op. on cross-motions for summary judgment at 3–4, J.A. at 18–19. In that later decision, the court found that Barnes had failed to show the agency's asserted reason for his discharge was pretextual, which subsumes a finding of no anti-union animus. *Barnes,* mem. op. at 8, J.A. at 14.

10. Appellant asserts the issue of collective bargaining contract violations was not raised before the FLRA General Counsel. But in its appeal of the FLRA Regional Director's decision not to issue an unfair labor practice complaint, Barnes' union specifically referred to relevant provisions of the collective bargaining agree-

ment. J.A. at 301. Appellant also argues that because the charging party for the unfair labor practice complaint was his union rather than he personally, the dismissal of that complaint is not relevant to his appeal before the MSPB. This argument is baseless. The petition for the unfair labor practice complaint and Barnes' appeal before the Merit Systems Protection Board concerned identical issues and asked for identical relief. This is not a case where a union seeks to enforce its "own independent rights" in an unfair labor practice proceeding. *See Cornelius v. Nutt,* 472 U.S. 648, 665 n. 20, 105 S.Ct. 2882, 2892 n. 20, 86 L.Ed.2d 515 (1985). We note also that Barnes gave the union "power of attorney to act for and on my behalf in all matters coincident to my case." J.A. at 286.

unreviewable. *Turgeon v. Federal Labor Relations Auth.*, 677 F.2d 937 (D.C.Cir. 1982) (per curiam). Hence, neither the district court nor this court may review appellant's unfair labor practice claims.

Appellant nevertheless asserts that because the Merit Systems Protection Board may not sustain an agency action if that action is shown to be "not in accordance with law," 5 U.S.C. § 7701(c)(2)(C), the MSPB was obligated to consider his unfair labor practice claims when he raised them as an affirmative defense to his discharge. And because the MSPB had jurisdiction over them, appellant argues, the district court should have considered his unfair labor practice complaints in its review of the MSPB decision. Despite appellant's claim, the "not in accordance with law" language does not give the MSPB authority to administer a body of law entrusted by the Federal Service Labor–Management Relations Act to the exclusive jurisdiction of the FLRA. *See* 5 U.S.C. § 7105; *Am. Fed'n of Gov't Employees, Local 2513 v. Federal Labor Relations Authority*, 834 F.2d 174, 176–78 (D.C.Cir.1987); *Columbia Power Trades v. United States Dep't of Energy*, 671 F.2d 325 (9th Cir.1982); *see also War-ren v. Local 1759, Am. Fed'n of Gov't Employees*, 764 F.2d 1395 (11th Cir.), *cert. denied*, 474 U.S. 1006, 106 S.Ct. 527, 88 L.Ed.2d 459 (1985). The Federal Service Labor–Management Relations Act does not provide for unfair labor practice claims to be made through the MSPB appeals procedure. 5 U.S.C. § 7116(d) (1982). ("Issues which can properly be raised under an appeals procedure may not be raised as unfair labor practices prohibited under this section."); *Berry v. Department of Justice*, 31 M.S.P.R. 676 (1986) (union's breach of duty of fair representation, an unfair labor practice charge under 5 U.S.C. § 7116, is not within Board's jurisdiction); *Bodinus v. Department of Treasury*, 7 M.S.P.B. 385, 388, 7 M.S.P.R. 536, 541 (1981) (complaint of agency's anti-union animus may constitute an unfair labor practice charge under 5 U.S.C. § 7116 and, as

such, is not within Board's jurisdiction); *see also Carter v. Kurzejeski*, 706 F.2d 835 (8th Cir.1983). Congress took great care to avoid "overlapping and inconsistent jurisdiction," *id.* at 840, for if both the Merit Systems Protection Board and the FLRA had jurisdiction over unfair labor practice claims, a coherent body of federal employee labor law could not develop. *See generally United States v. Fausto*, — U.S. —, 108 S.Ct. 668, 672, 98 L.Ed.2d 830 (1988) (Civil Service Reform Act of 1978 provides "an integrated scheme of administrative and judicial review" that takes into account "the needs of sound and efficient administration"); *Vaca v. Sipes*, 386 U.S. 171, 179, 87 S.Ct. 903, 911, 17 L.Ed.2d 842 (1967) (necessity of centralized administration of the National Labor Relations Act to insure uniform application of its substantive rules).

In *United Food & Commercial Workers International Union v. NLRB*, 675 F.2d 346 (D.C.Cir.1982), this court held that the National Labor Relations Board was required, in an unfair labor practice proceeding, to hear a party's defense even if based on a claim previously rejected by the General Counsel of the NLRB. Appellant would have us, by way of analogy, require the Merit Systems Protection Board to hear his claim of an unfair labor practice when raised defensively. But appellant's comparison between the NLRB and the Merit Systems Protection Board breaks down at a crucial point—the NLRB, unlike the Merit System Protection Board, has the authority and the duty to adjudicate unfair labor practice complaints. *Id.* at 354–56. Thus in the *United Food* case, this court held that excluding a defense based on a complaint previously rejected by the NLRB General Counsel was inconsistent with the NLRB's adjudicatory function. By contrast, the Merit Systems Protection Board has no authority to adjudicate an unfair labor practice complaint—a function entrusted exclusively to the FLRA. Because the Merit Systems Protection Board did not have jurisdiction in the first instance over Barnes' unfair labor practice claims, the

district court, of course, did not itself acquire jurisdiction through appellate review of the Board's decision. We therefore affirm the district court's granting of summary judgment to the agency on these claims.[11]

Finally, Barnes argues that his statements cannot, as a matter of law, be a legitimate justification for his discharge, because they were protected by the First Amendment. The MSPB correctly rejected this claim. It is now settled law that the government "may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson,* — U.S. —, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987). *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) requires courts to balance the employee's interest in speaking on matters of public concern against the government's interest, as an employer, in efficient operations. Not all employee speech implicates the First Amendment to the same degree, however. Before engaging in the *Pickering* balancing test, a court must find, as a threshold matter, that the employee's speech addresses a matter of "public concern." *Rankin v. McPherson,* 107 S.Ct. at 2896–97; *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983); *Am. Postal Workers Union v. United States Postal Serv.,* 830 F.2d 294, 300 (D.C.Cir.1987). For, "[w]hen employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Connick,* 461 U.S. at 146, 103 S.Ct. at 1690.

We must determine whether an employee's speech is protected under the *Pickering* doctrine by examining "the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. at 1690.[12] Although the line between speech of largely parochial character and speech that "addresses a matter of public concern" is not always clearly discernible, we agree with the district court that, judged according to the applicable Supreme Court precedent, Barnes' letters fall far short of the "public concern" standard. In *Pickering,* a public school teacher participated in an ongoing debate in the local newspaper concerning a proposed bond issue. As such, his statements constituted classic political speech at the core of First Amendment concerns. And in *Rankin,* the conversation in question concerned the public policies of the Reagan administration and "came on the heels of a news bulletin regarding what is certainly a matter of heightened public attention: an attempt on the life of the President." 107 S.Ct. at 2898 (footnote omitted). Again, the speech was overtly political. In *Connick,* by way of contrast, the communication, a questionnaire prepared by a disgruntled employee, largely related to internal administrative matters such as transfer procedures or office morale—subjects of pressing import only to other employees in the speaker's office. This speech was therefore held *not* to touch on matters of public concern. Similarly, as Barnes' letters addressed only the misbehavior of other employees in his office, and not matters relating to any broader public interest, his discharge for writing them does not violate the First Amendment. "Speech by public employees may be characterized as not of 'public concern' when it is clear that such speech deals with individual personnel dis-

---

**11.** Appellant also asserts that the MSPB violated § 7701(c)(2)(A) which provides that "[t]he agency's decision may not be sustained ... if the employee ... (A) shows harmful error in the application of the agency's procedures in arriving at such decision." *See Cornelius v. Nutt,* 472 U.S. 648, 659, 105 S.Ct. 2882, 2889, 86 L.Ed.2d 515 (1985) ("agency's failure to follow bargained-for procedures may result in its action's being overturned" by the MSPB). Appellant has

failed to identify what required procedures were not followed by the MTMC in reaching its decision, much less to show that such failure was harmful.

**12.** "The inquiry into the protected status of speech is one of law, not fact." *Connick,* 461 U.S. at 148 n. 7, 103 S.Ct. at 1690 n. 7.

putes and grievances and that the information would be of no relevance to the public's evaluation of the performance of governmental agencies...." *Murray v. Gardner,* 741 F.2d 434, 438 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1050, 105 S.Ct. 1748, 84 L.Ed.2d 813 (1985) (quoting *McKinley v. City of Eloy,* 705 F.2d 1110, 1114 (9th Cir.1983)); *see also Callaway v. Hafeman,* 832 F.2d 414 (7th Cir.1987); *Linhart v. Glatfelter,* 771 F.2d 1004, 1009–11 (7th Cir. 1985).

Appellant contends that because his statements reported perceived misconduct by government officials charged with carrying out congressionally mandated programs such as equal employment opportunity policies or else concerned union-related activity, they necessarily addressed matters of public concern.[13] This argument, however, proves too much. In some sense, everything that goes on in a government office is of concern to the public since all government employees carry out programs that elected officials have mandated and thus must deem of public importance. But *Connick* specifically rejected this expansive line of reasoning: "To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark— and certainly every criticism directed at a public official—would plant the seed of a constitutional case." *Connick,* 461 U.S. at 149, 103 S.Ct. at 1691; *see also Murray v. Gardner,* 741 F.2d at 438.

As a variation on his First Amendment claim, Barnes contends that all the language in the letters was protected because it related to union matters, and, under the doctrine of *Old Dominion Branch No. 496 v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974), even abusive or insult-

ing language by a labor organization is independently protected by federal labor relations law.[14] We think, however, this argument is merely another form of appellant's unfair labor practice claim. In his appeal from the decision of the FLRA Regional Director not to issue an unfair labor practice complaint, Barnes also argued that his dismissal had violated the doctrine of *Old Dominion.* J.A. at 313–326. As we have said, the FLRA rejected this claim, finding that Barnes' statements "constituted flagrant misconduct which is outside the protection of § 7102 of the [Act]." J.A. at 298. The FLRA's rejection of this claim and its decision not to issue an unfair labor practice complaint is unreviewable here, and Barnes cannot achieve *de facto* review by asking this court to overturn his dismissal based on arguments properly addressed to and rejected by the FLRA.

In any event, *Old Dominion* concerned the intersection of state libel law and federal labor relations law—not dismissal from public employment. The Supreme Court has consistently noted that dismissal from employment and libel actions trigger different sorts of First Amendment analysis. *See, e.g., Connick,* 461 U.S. at 147, 103 S.Ct. at 1690 ("an employee's false criticism of his employer on grounds not of public concern may be cause for his discharge but would be entitled to the same protection in a libel action accorded an identical statement made by a man on the street."); *Pickering,* 391 U.S. at 574, 88 S.Ct. at 1737–38 ("disinclination to make an across-the-board equation of dismissal from public employment for remarks critical of superiors with awarding damages in a libel suit by a public official for similar criticism"). If Cunningham sued Barnes for libel, then perhaps the doctrine of *Old Dominion* would be a relevant defense, but

---

**13.** Barnes' letters were union-related in that they discussed matters peculiarly relevant to the union local Barnes was acting president of, such as tardy notification of adverse personnel actions—matters of significance to the union movement as a whole were not discussed. The letters were not, for example, "concerned with efforts to reinvigorate the trade union movement [or] ... to combat the threat to organized

labor from 'right to work' laws." *American Postal Workers Union,* 830 F.2d at 301.

**14.** In *Old Dominion,* the Court interpreted Executive Order No. 11491, the predecessor to the Federal Service Labor–Management Relations Act.

where the issue is the propriety of dismissal, the relevant cases are *Pickering, Connick,* and *Rankin,* and, as we have shown, Barnes' speech is not protected by the law set forth in this line of cases. *See Am. Postal Workers Union,* 830 F.2d at 312.

Accordingly, we affirm the district court's holding that the decision of the MSPB was not arbitrary and capricious, was supported by substantial evidence, and was in accordance with applicable law.